UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DAVID BRUCE SPENCER, ET AL. | * | CIVIL ACTION |
| VS. | * | NO. 06-4254 |
| KALLIN L. BROOKS, ET AL. | * | SECTION B |
| | * | MAGISTRATE JUDGE 2 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE
TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT FINLEY HILLIARD</u>**

      Kallin L. Brooks and GEICO, Defendants, through undersigned counsel, submit this memorandum in support of their Motion for the entry of an Order excluding the testimony of Plaintiffs' expert, Finley Hilliard.

**I.     INTRODUCTION / FACTUAL BACKGROUND**

      This litigation arises from a three-car accident that occurred July 8, 2005, in New Orleans, Louisiana. The sole plaintiffs, David and Deborah Spencer, have brought claims against the United States pursuant to the Federal Tort Claims Act ((FTCA), 28 U.S.C. (2671 *et seq.*)), and against Kallin L. Brooks and GEICO under Louisiana state tort law. As a result of this accident, the plaintiffs allege numerous personal injuries as well as lost past personal income, future personal income, and corporate income to their closely held corporation, Spencer

Investments Corporation. Spencer Investments Corporation is a C-Corporation with its primary business as The Cornstalk Hotel, a boutique hotel located in the French Quarter of New Orleans, Louisiana. David and Deborah Spencer are the sole shareholders of Spencer Investments Corporation with each owning exactly fifty percent (50%) of the corporation.

In an effort to substantiate their lost income claims, Plaintiffs secured Finley Hilliard, a certified public accountant, as their financial expert. On July 27, 2009, Defendants received a report signed by Mr. Hilliard that analyzed the Plaintiffs' alleged past lost income and projected the plaintiffs' future lost income. In summary, as a result of the alleged injuries sustained by Mr. Spencer from the accident, Mr. Hilliard contends that the decline of and lost income to The Cornstalk Hotel has resulted in lost past and future income to the plaintiffs. In support of this conclusion, Mr. Hilliard takes into account the plaintiffs' alleged increased costs incurred due to the hiring of a general manager to take over the bulk of Mr. Spencer's duties that he is no longer able to perform.

Defendants emphasize that Mr. Spencer was deposed on March 24, 2009 and questioned regarding any potential lost income claims. Mr. Spencer, an attorney, testified as follows:

> Q. Well, let me ask you, what were you being paid by Spencer Corporation before July 8th, 2005?
> A. Professional fees based upon a legal and management services contract of $120,000. I believe my compensation was at that level, $120,000 for 12 years – don't hold me to that – 12 years or so.
> Q. For 12 years or so before the accident?
> A. Before the accident.
> Q. And how has that changed, if at all, since July 8th, 2005?
> A. It's been cut in half.

See Exhibit "A", p. 86, lines 5-18.

> Q. All right. Are you claiming as part of your damages for July 8th, 2005 motor vehicle accident an income loss of $60,000 per year since the accident occurred?
> A. Yes.

5

See Exhibit "A", p. 92, lines 13-17.

Q. Are you claiming to have lost any income from any source as a result of the July 8th, 2005 accident other than your income for professional services with Spencer Investments?
A. No, sir.
Q. So however that turns out, that is your sole source of your lost-wage claim; is that correct?
A. Yeah. I'd sure like to throw some stock market losses in there and capital gain losses, but no.

See Exhibit "A", p. 99, lines 10-21.

As the previous testimony shows, at no time did Mr. Spencer ever suggest that he would be asserting any types of claims commensurate with Mr. Hilliard's opinions.

In response to Mr. Hilliard's report, Defendants' retained experts John McMahon, a certified public accountant and attorney, and Dr. Ivan Miestchovich, the Director of Center of Economic Development for the University of New Orleans. Both experts have rendered reports regarding the plaintiffs' lost income claims. Mr. McMahon's report focuses on the personal lost wage claim, whereas Dr. Miestchovich's report focuses on the lost corporate income. Both experts strongly disagree with not only the methodology utilized by Mr. Hilliard, but contest his use of speculative and unreliable facts and information to reach his conclusions.

Moreover, Defendants remind this Honorable Court that they have filed a motion for summary judgment seeking dismissal of plaintiffs' claims for past and future lost corporate income based upon the failure of plaintiffs' to include the proper party to assert these claims. It is clear that the proper party to assert such claims is Spencer Investments Corporation and not David and Deborah Spencer, individually. As such, this motion and Defendants' previously filed motion for summary judgment contain related issues.

6

## II.   LAW

### A.   Plaintiffs Bear The Burden Of Establishing Admissibility Under <u>Daubert</u>

District courts have broad discretion to exclude improper expert testimony under *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244–45 (5th Cir. 2002). The proponent of expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *Nugent v. Hercules Offshore Corp.*, 2000 U.S. Dist. LEXIS 5082, at *5 (E.D. La. Apr. 14, 2000).

Rule 702 governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2007).

*Daubert* provides a two-prong test for determining the admissibility of expert testimony. The court "must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id* at 595. This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

*Daubert* charges trial courts to act as "gate-keepers" to ensure that the proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589, 592-93. The relevant and reliable standard announced in *Daubert* for scientific expert testimony applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. at 147. "The focus of the *Daubert* inquiry should be on the methodology used, not on the conclusions reached." *Walker v. Yellow Freight Sys., Inc.*, 1999 U.S. Dist. LEXIS 15012, at *18 (E.D. La. 1999). Any analytical gap can be a sufficient basis to exclude testimony. *See In re: Vioxx Products Liability Litigation*, 414 F. Supp. 2d 574, 579 (E.D. La. 2006). Consequently, a step in the expert's analysis that renders the opinion unreliable – whether that step changes a methodology or misapplies the methodology – causes that testimony to be inadmissible. *See Curtis*, 174 F.3d at 670-71 (quoting *In re: Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994)); *Chambers v. Exxon Corp.*, 661 F. Supp. 2d 661, 663 (M.D. La. 2000) *aff'd* 247 F.3d 240 (5th Cir. 2001). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 277 (5th Cir. 1998); *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999) (quoting *Kumho Tire v. Carmichael*, 526 U.S. 137, 157 (1999)).

Beyond proper qualifications and reliability, the proffered expert's testimony must be helpful to the trier of fact. In other words, the testimony must "fit" the facts of the case and not usurp the jury's primary role as evaluator of evidence. *See Daubert*, 509 U.S. at 591; *Kirkland v. Marriott Int'l Inc.*, 416 F. Supp. 2d 480, 483 (E.D. La. 2006); *Nugent*, 2000 U.S. Dist. LEXIS 5082, at *7.

8

## II. ARGUMENT: FUNDAMENTAL FLAWS WITH FINLEY HILLIARD'S METHODOLOGY

### A. Authorization of Mr. Hilliard's Report

Defendants are compelled to alert this Court of the circumstances behind the preparation and authorization of the expert report signed by Mr. Hilliard. As testified by Mr. Hilliard, a non-licensed employee within his office, Chris Klein, prepared the expert report for Mr. Hilliard's signature. See Exhibit "B", p.3[1]. According to Mr. Hilliard, he supervised much of Mr. Klein's work and calculations, but a great deal of the relevant information from Mr. Spencer and plaintiffs' counsel was passed onto Mr. Klein directly, rather than to Mr. Hilliard. See Exhibit "B", p. 3; p.7. Therefore, Mr. Hilliard was unable to provide testimony regarding certain conversations that occurred with Mr. Spencer or plaintiffs' counsel.

### B. Projected Lost Wage Methodology

Mr. Hilliard calculates the plaintiffs' alleged lost wages by projecting the gross receipts or sales over the next fifteen years using a fixed straight-line method in which an inflation rate of 2.7% is multiplied to each year. See Exhibit "C", p. 13. The Defendants oppose Mr. Hilliard's straight-line methodology and the conclusions made for three reasons.

#### i. Straight-line Method of Forecasting Utilized by Hilliard is Unreasonable and Uncommon

First, the Defendants contend that the straight-line method employed by Mr. Hilliard is speculative, unreasonable, and uncommon in the marketplace. As stated by Dr. Miestchovich in his report, "peering into the distant future is speculative at best, particularly when the analyst provides no substantiation or support for the assumptions underpinning the projections." See Exhibit "D", p. 4. Dr. Miestchovich continued these thoughts at his deposition when he stated:

---

[1] Defendant's received a copy of Mr. Hilliard's deposition transcript on September 25, 2009 via e-mail from plaintiffs' counsel. The e-mailed version did not contain line citations within the deposition. Therefore, Defendants are unable to provide the specific lines for any citation to Mr. Hilliard's deposition.

9

| | |
|---|---|
| A. | Doing anything with a straight-line projection or -- of the past -- excuse me -- of the future being a straight-line extrapolation of the future is highly risky and somewhat unreasonable. |
| Q. | Do you agree that it's common in the marketplace for it to be done that way? |
| A. | I don't think it's common. I think there are many people, many analysts, when I read reports and review different types of studies, acknowledge that, you know, doing a straight-line of anything is a little-bit risky – a little bit more than risky and, therefore it's much better to come up with scenarios that look at various growth rates that may, in fact turn negative. So, extrapolating on a straight-line basis is really asking for too many assumptions to be accepted going forward. |

See Exhibit "E", p. 29, lines 18-25; p.30, lines 1-12.

Additionally, Mr. Hilliard admits that it is uncommon for him to project out fifteen years:

| | |
|---|---|
| Q. | In your opinion, is it normal to have a projection go out 15 years or more? |
| A. | It's been done, but it's not -- it's not common. |

See Exhibit "B", p. 86.

### ii. Gross Receipts or Sales Do Not Increase Unconditionally with Inflation Rates

Directly related to Mr. Hilliard's improper utilization of the straight-line method is Mr. Hilliard's improper and unreasonable assumption that the sales of the hotel "would increase at an average inflation rate of 2.7% per year." See Exhibit "C", p. 2. According to Mr. Hilliard, this percentage was determined by taking the average annual inflation rates over the last 15 complete calendar years (1994 through 2008) (Exhibit "C", p. 2). As the language from the report reads, Mr. Hilliard bases the potential growth rate of the hotel solely on the inflation rate and fails to consider several additional factors that go into calculating a potential growth rate. The Hilliard report neglects to consider market trends or economic conditions that would affect the potential growth rate of the Cornstalk Hotel, i.e. the hotel's ability to increase sales annually. These economic conditions may include, but are not limited to, the rebuilding process of New Orleans

post-Katrina; the national economy; tourism; scheduling of conferences and seminars; crime; and sporting events all of which play a part on the future occupancy of a New Orleans' hotel.

In summary, the Defendants' do not question Mr. Hilliard's use of the average inflation rate as <u>a factor</u> to determine the growth rate, but, rather, question Mr. Hilliard's use of the inflation rate as the <u>sole factor</u> to determine growth rate. Dr. Miestchovich has testified as follows:

> A.  ...my opinion is that just using inflation to try to forecast anything – first of all we don't know what inflation's going to do, and trying to peg everything just to a – an imputed inflation rate is not reasonable with regard to the multiplicity of dynamics that go in a marketplace, and room rates or rents or whatever; they might move in total opposite direction of what the inflation rate would be.
> Q.  So, you agree that the inflation rate is one factor to be considered with other – other growth rate – other growth factors, correct?
> A.  It's one factor, but it's certainly not the best.

See Exhibit "E", p. 26, lines 10-25.

Therefore, while Mr. Hilliard's use of the average inflation rate for the potential growth rate of the Cornstalk Hotel may be one factor to consider, it is unreasonable to use it as the sole factor.

> iii. **Projected Gross Sales are based on average revenue from the three years prior to Hurricane Katrina.**

Third, the Defendants believe that in preparing the future hotel sales projections Mr. Hilliard should have considered several fundamental market analysis factors. These would include, but are not limited to: 1) The location of the subject property; 2) the growth of the business and the share to be captured by the hotel; 3) the sources and volume of transient and destination travel in the New Orleans market and how the Cornstalk could tap into this demand; 4) the location of competitive properties and an assessment of their characteristics and how these competitors would effect the Cornstalk over the short, intermediate, and long term; 5) current

11

and future travel patterns on a regional, national, and global scale; and 6) special events and trends that are unique to New Orleans in general and the Cornstalk in particular. See Exhibit "D", p. 4.

Unfortunately, Mr. Hilliard failed to consider these fundamental factors that directly impact the occupancy level and room rates and, thus, the potential revenue for the Cornstalk Hotel. Rather Mr. Hilliard bases his initial projected sales in 2010 off of the average revenue for the three years prior to Hurricane Katrina (2003, 2004, and 2005). Defendants contend that Mr. Hilliard, rather than hand-pick three years, should have calculated the average annual revenue for the entire lifespan of the hotel or, alternatively, he should have used a greater sample size. As such, Defendants believe that the use of this greater sample size would depict a more accurate and reliable gross sales projection. Further, Mr. Hilliard testified that he has no concrete knowledge as to what the current business market is in New Orleans. See Exhibit "B", p. 61. Without knowledge of the current economic vitality of New Orleans, Mr. Hilliard cannot provide reasonable projections for the gross sales of the hotel.

As an aside, Defendants point out that Mr. Hilliard was unaware of the status of the Cornstalk Hotel post-Katrina; unaware that a business interruption claim had been made by the Spencers; and unaware that the Spencer's recovered money for their alleged lost income post-Katrina. None of these facts are part of Mr. Hilliard's analysis.

### C. Hilliard's Assumption as to the Reasonableness of Louis Darmiento's Salary

The plaintiffs' future lost income claim centers on the contention that Mr. Spencer's injuries sustained in the accident prevent him from performing his duties at the hotel. Accordingly, the plaintiffs aver that they have been forced to hire a general manager, Louis Darmiento, to take over the bulk of Mr. Spencer's duties, even though Mr. Darmiento was hired

12

in April of 2009, nearly four years after the accident. As such, incorporated into Mr. Hilliard's projection for future lost income are the increased costs of paying Mr. Darmiento's salary. The alleged current compensation agreement between Mr. Darmiento and Spencer Investment Corporation is a salary of $10,400 and weekly commissions of 20% of gross sales until the hotel reaches $250,000 in gross sales, and 25% for all sales above that, for each fiscal year.[2]

Foremost, the Defendants seriously question what appears to be an extremely generous commission for a general manager of a small boutique hotel containing only 13 rooms. Mr. Darmiento has testified that he has no prior hotel management experience, education, or training. See, Exhibit "F", p.59, lines 10-19. He was hired via Craigslist as a night watchman who returned phone calls. See Exhibit "F", p.12, lines 7-13; p.14, lines 11-24. Mr. Darmiento had not held a job for over thirty years when he worked for Security Pacific Bank in California. See Exhibit "F", p.9, lines 9-17. As Dr. Miestchovich's report provides, general managers in New Orleans holding bachelor degrees in hotel, restaurant and tourism with less than five years experience on average earn $41,629, while those in the top quartile earn roughly $59,939. In the United States, hotel general managers salaries typically range from $40,000 to $50,000 for individuals with less than one year of experience. See, Exhibit "D", p. 6. When considering Mr. Darmiento's lack of experience, education, and training in the hotel industry, it becomes clear that the plaintiffs are severely overpaying their new employee and casts serious doubts upon plaintiffs' motives for hiring Mr. Darmiento.

While the Defendants question Mr. Darmiento's salary, what concerns the Defendants even more is Mr. Hilliard's blind acceptance of Mr. Darmiento's compensation and unwillingness to examine whether Mr. Darmiento is truly providing the services that Mr.

---

[2] There is no written compensation agreement for Louis Darmiento with Spencer Investments Corporation, the Cornstalk Hotel or the Spencers.

13

Spencer previously provided to the hotel. Mr. Hilliard has testified that has never seen a contract between Spencer Investments Corporation and Mr. Darmiento, but rather that he was provided the particulars regarding Mr. Darmiento's salary.

As previously mentioned, the crux of the plaintiffs' future income claim is the plaintiffs need to hire a general manager because of Mr. Spencer's alleged inability to perform his duties at the hotel due to his alleged injuries. Therefore, it is vital that the plaintiffs and Mr. Hilliard prove that Mr. Darmiento is providing the services that Mr. Spencer claims to have provided to the hotel prior to the accident.

As the following indicates, Mr. Hilliard testified that he did <u>not</u> question the viability of the plaintiffs' claims and, more importantly, that his opinion becomes unreliable should it be shown that Mr. Darmiento has <u>not</u> taken over the duties of David Spencer. As such, Defendants contend that his opinions regarding Mr. Darmiento's salary are based on insufficient facts and therefore unreliable:

> Q. But you were using, Mr. Hilliard, the compensation of Mr. Darmiento as a factor regarding the income claims for David and Debra Spencer, correct?
> A. Yes, sir.
> Q. As we sit here today, in September of 2009, even though Mr. Darmiento's compensation is a factor regarding your analysis of the income claims, you have never taken the steps to determine whether or not his compensation is reasonable, have you?
> A. Yes, sir.

See, Exhibit "B", p. 29.

> Q. So, if you were to learn that this new general manager's duties are completely separate or differ from what Mr. Spencer was actually doing, would this change your opinion?
> A. Yes, sir. I mean, if he wasn't doing something that David was doing before, I mean, you know, hey.
> Q. You testified earlier that you haven't had any conversations with the general manager yourself?
> A. No, sir.

14

Q. So, you don't have any idea as far as what his job is or what his responsibilities are?
A. No, sir.
Q. You don't have any idea as far as what job or responsibilities or duties Mr. Spencer was doing pre-accident or post-accident?
A. Not other than hearsay.
Q. Did you do anything in an effort to try to find out more information in that regard?
A. No, sir. I just simply stuck to that which was assigned to me.
Q. Do you not feel as that that is particularly important, if the roles or responsibilities are indeed different?
A. Not if that's what I've been called to do. I mean, at this point, if I – if I'm called to do a projection, I'm not going to call a person that's hiring me…It's just not my job. I'm just trying here to quantify and qualify the damages.

See, Exhibit "B", p. 78-79.

Q. So, I want you to assume that Mr. Darmiento's job doesn't entail generating business for the Cornstalk Hotel. With that assumption, could we agree that we cannot rely on your opinion?
A. If he's doing nothing, absolutely. I mean, I guess he's just coming up and showing up and somebody's giving him $90,000 a year…

See, Exhibit "B", p. 82.

Without examining whether Mr. Darmiento has taken over the majority of Mr. Spencer's duties, Mr. Hilliard's testimony regarding Mr. Darmiento is completely speculative and unreliable and Mr. Hilliard should be precluded from testifying as such.

### D. Hilliard's Calculation of the General Manager's Projected Salary

Even if Mr. Darmiento's commission-based salary is reasonable and Mr. Hilliard had no duty to investigate its' reasonableness, Mr. Hilliard's methodology in projecting Mr. Darmiento's future salary and lost profits to the Cornstalk hotel is flawed because his analysis is based on speculation. Therefore, Mr. Darmiento's projected salary should be deemed unreliable.

Specifically, the problem, here, is that the plaintiffs' alleged lost wages are directly related to the success of the Cornstalk Hotel. As shown in Exhibit E1 of Exhibit "C" (Hilliard's

report), Mr. Hilliard attempts to calculate the plaintiffs' increased costs incurred from Mr. Spencer's injuries. This process requires projecting Mr. Darmiento's salary and the Cornstalk hotel's gross sales starting in 2010. The initial problem is that Mr. Darmiento's projected salary is based on another projected and unreliable number, the gross receipts or sales in 2010. As stated above, this projected number was determined by averaging the revenue of the three years prior to Hurricane Katrina rather than the averaging revenue of the hotel's entire history, spanning over a period of 60 years. Alternatively, Defendants contend that averaging the last ten or fifteen years of revenue would have been a more reliable approach. Additionally, this approach neglects to consider fundamental factors that directly impact the occupancy level and room rates of the Cornstalk Hotel, like supply and demand, the economy, or tourism. These factors are described in full above. See Section (B)(iii).

Second, the Defendants contend that this projection is completely speculative and unreliable because Mr. Darmiento was hired in April of 2009, roughly five months ago. Therefore, the projection of Darmiento's salary for 2010 is based on a diminutive sample size. There is no history of past commissions paid to Mr. Darmiento or any other manager of the hotel. From all accounts, this is the first time that the Spencers have paid a manager on commission. Therefore, Mr. Hilliard cannot accurately predict Mr. Darmiento's salary. Furthermore, the Defendants contend that not only is the initial projection of Mr. Darmiento's salary in 2010 unreliable, but Mr. Darmiento's salary becomes less reliable and more speculative into the future. Hilliard confirmed these opinions in his deposition:

> Q. He started in April. We're in September of 2009. Do we have a history of one year of full compensation for Mr. Darmiento?
> A. No.
> Q. So, we don't even know, because part of his compensation, in fact, the majority of his compensation, is based upon the performance of the hotel, really, what his income is going to be in 2010, don't we?

16

A. Oh, no.
Q. It's all speculative at this point?
A. That's what projections and forecasts are.

See, Exhibit "B", p. 72.

Q. What about for year five? Do you feel good about the reliability of that number? Or does it become less reliable as we go forward in time?
A. Well, I can understand that question. Yes, the further you go in the future, the less reliable your numbers are.

See, Exhibit "B", p. 72.

IV. **CONCLUSION**

Mr. Hilliard's conclusion that David and Deborah Spencer have suffered personal lost income and will incur future lost income due to the decline in their closely-held corporation, Spencer Investment Corporation d/b/a The Cornstalk Hotel, is based on speculative and unreliable information. Additionally, the reasons set forth in his expert opinion do not establish a proper methodology and Mr. Hilliard fails to recognize several significant factors that may affect Spencer Investments Corporation d/b/a The Cornstalk Hotel future gross sales. Therefore, his opinions should be excluded in their entirety.

Respectfully submitted:

/s/Louis P. Bonnaffons
**LOUIS P. BONNAFFONS (#21488)(T.A.)**
lbonnaffons@leakeandersson.com
**W. PAUL ANDERSSON (#2474)**
pandersson@leakeandersson.com
**DEAN M. ARRUEBARRENA (#24283)**
darruebarrena@leakeandersson.com
**RYAN M. CASTEIX (#31656)**
rcasteix@leakeandersson.com
Leake & Andersson L.L.P.
1100 Poydras Street, Suite 1700
New Orleans, LA 70163
Telephone: (504) 585-7500
Facsimile: (504) 585-7775

17

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been electronically filed and delivered to all counsel of record by notice of electronic filing by the court, by depositing a copy of same in the United States mail, first class postage prepaid, by hand delivery or by facsimile transmission, this 30th day of September, 2009, at their last known address of record.

                                        /s/Louis P. Bonnaffons  
                                        LOUIS P. BONNAFFONS